J-S46017-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| S.H.,B.H.,T.H., MINORS | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.D., MOTHER AND B.H., | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | No. 934 EDA 2018 |

Appeal from the Decrees Entered February 21, 2018
In the Court of Common Pleas of Monroe County Orphans' Court at
No(s): CP-45-DP-0000060-2015,
CP-45-DP-0000061-2015, CP-45-DP-0000062-2015

BEFORE: BOWES, J., SHOGAN, J., and KUNSELMAN, J.

MEMORANDUM BY SHOGAN, J.: **FILED AUGUST 21, 2018**

L.D. ("Mother") and B.H. ("Father") appeal the decrees terminating their parental rights to their daughters, S.H. (born in July of 2010) and T.H. (born in September of 2008), and their son, B.H. (born in June of 2011) (collectively, "the Children").[1] We affirm.

---

[1] Our rules of appellate procedure provide that, "[w]here . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed." Pa.R.A.P. 341, Note (citing ***Commonwealth v. C.M.K.***, 932 A.2d 111, 113 & n.3 (Pa. Super. 2007)). Similarly, Pa.R.A.P. 301(b) requires that "[e]very order shall be set forth on a separate document." Recently, the Pennsylvania Supreme Court held "that prospectively, where a single order resolves the issues arising on more than one docket, separate notices of appeal must be filed for each case." ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018).

In an opinion filed on April 23, 2018, the orphans' court provided a thorough recitation of the facts and procedural history of this case. Orphans' Court Opinion, 8/23/18, at unnumbered 1–9. Given that recitation and the parties' familiarity with these matters, we provide the following summary: Monroe County Children and Youth Services ("CYS") took the Children into protective custody on June 11, 2015, at which time Mother faced drug charges and Father was incarcerated. N.T., 2/21/18, at 11–12, 44. Following a shelter care hearing on June 16, 2015, Paternal Grandmother became a resource for the Children and assumed legal and physical custody of them. *Id.* at 12–13.

---

In the case at hand, the orphans' court entered three decrees terminating parental rights on three different dockets, but Mother and Father filed a single notice of appeal. "Generally, such an appeal will not be quashed if (1) the issues in the separate orders are nearly identical, (2) no objections to the appeal are raised, and (3) the appeal period has expired." West Pa. Digest, *Appellate Practice* § 512:2 (footnotes omitted).

*Walker* is a criminal case involving one notice of appeal for a single order disposing of three dockets. The case before us is a Family Fast Track and involves one notice of appeal for three decrees. In light of these substantive and procedural differences, we consider *Walker* inapposite. Furthermore, the issues in the separate termination decrees are identical, no objections to the single appeal are raised, and the appeal period has expired. Therefore, we shall entertain this appeal. Nevertheless, we remind counsel that compliance with Pa.R.A.P. 301(b) is mandatory.

Finally, we see no impediment to Mother and Father filing a joint notice of appeal. Mother and Father are severally interested in the decrees terminating their parental rights to their three children and their grounds for appeal are similar; therefore, they "may join as appellants in a single appeal[.]" Pa.R.A.P. 512. Moreover, we are satisfied with the explanation for the public defender's dual representation of Mother and Father provided in response to our Rule to Show Cause. Appellant's Answer to Rule to Show Cause, 6/6/18, at ¶¶ 2–6.

Due to financial constraints and personal issues, Paternal Grandmother ceased being a resource on May 14, 2016, at which time both Mother and Father were incarcerated, and no other family members were available to care for the Children. Consequently, CYS assumed protective custody of the Children and placed them in foster care. *Id.* at 14. Following a dependency hearing on May 26, 2016, the Children were adjudicated dependent; since that hearing, they have remained dependent and in care with the same foster mother, C.S. *Id.* at 14–16, 33.

Paternal Grandmother voluntarily withdrew from the Children's lives in February of 2017. N.T., 2/21/18, at 24. Mother was incarcerated from June of 2015 to June of 2017, at which time she was released to a halfway house; she will be on parole until June 11, 2021. *Id.* at 20, 25–26, 34, 74, 85, 89. Father was incarcerated since before the Children were adjudicated dependent and throughout the underlying proceedings. *Id.* at 12, 23, 26–27. While incarcerated in Pennsylvania, Father had several visits with the Children. *Id.* at 23, 25, 35, 40–41, 55. Father is eligible for release in February of 2019, after which he will be under federal supervision until 2021. *Id.* at 23, 26–27, 35, 49, 57, 67.

CYS sent letters to Mother and Father in early October of 2017, notifying them that CYS would be filing petitions for termination of their parental rights. N.T., 2/21/18, at 28–29. CYS then filed the termination petitions in late

October of 2017,[2] with service of Mother on November 15, 2017, and of Father on December 13, 2017. *Id.* at 9–10. CYS conducted a foster home visit on November 16, 2017; the caseworker observed that the Children were bonded to C.S. *Id.* at 29–30, 33–34. C.S. told the caseworker she wants to be an adoptive resource for the Children. *Id.* at 33. On February 9, 2018, almost eight months after her release from prison and four months post-petitions for termination, Mother visited the Children; she acted appropriately and brought the Children gifts. *Id.* at 31–32, 35.

The orphans' court conducted a termination hearing on February 21, 2018. At that point, the Children had been in foster care for twenty-two months. N.T., 2/21/18, at 93. Based on the evidence presented at the

_____

[2] The orphans' court appointed the Children's Guardian *Ad Litem*, Brandie J. Belanger, Esq., as their legal counsel. Order, 10/26/17. A child's guardian *ad litem* may serve also as his or her legal counsel, so long as there is no conflict between a child's best and legal interests. *In re Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017); *In re D.L.B.*, 166 A.3d 322, 329 (Pa. Super. 2017). Our review of the record reveals there is no conflict between the Children's best and legal interests:

> MS. BELANGER: . . . I have met with the [C]hildren. . . . They are happy and content living with [C.S.] and they are looking forward to her being their forever mom.
>
> THE COURT: Okay, then for the record . . . there is no issue or difference of opinion between . . . what's best for the [C]hildren and their desires, right?
>
> MS. BELANGER: No Your Honor.

N.T., 2/21/18, at 51. Therefore, we need not remand for the appointment of separate counsel.

- 4 -

hearing, the orphans' court concluded that CYS established grounds for termination of Mother's and Father's parental rights under subsections 2511(a)(1), (2), (5), (8), and 2511(b). *Id.* at 96–105. Mother and Father appealed and, along with the orphans' court, complied with Pa.R.A.P. 1925.

On appeal, Mother and Father state two questions for our consideration:

> Did [CYS] fail to present clear and convincing evidence that termination of parents' parental rights served the needs and interests of their [children]?

> Did [orphans'] court err in terminating parental rights without clear and convincing evidence that termination of parents' parental rights served the needs and interests of their children?

Mother and Father's Brief at 12.

In reviewing an appeal from an order terminating parental rights, we adhere to the following principles:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re R.I.S.*, 614 Pa. 275, 36 A.3d 567, 572 (Pa. 2011) (plurality). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel–Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 455, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

**In re I.E.P.**, 87 A.3d 340, 343–344 (Pa. Super. 2014) (quoting **In re Adoption of S.P.**, 47 A.3d 817, 826–827 (Pa. 2012)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that the "standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" **Id**. (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)). Moreover, this Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

- 6 -

Here, the orphans' court terminated Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Orphans' Court Opinion, 4/23/18, at unnumbered 27, 28. We focus our review on subsections (a)(1), (2), and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511. This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but under section

- 7 -

2511(b), the focus is on the child. ***In re Adoption of C.L.G.,*** 956 A.2d 999, 1008 (Pa. Super. 2008) *(en banc).*

Mother and Father complain that CYS "provided no testimony regarding a lack of bond between [Mother] and [Father] and the [C]hildren." Mother and Father's Brief at 15. Moreover, they argue, "[Mother and Father] have been incarcerated through the majority of this case and have taken parenting and drug classes while they were incarcerated. [CYS] has failed to prove that [the Children's] needs and welfare will be served by terminating [Mother's and Father's] parental rights." Mother and Father's Brief at 15–16. In addressing each of the subsection grounds for termination relied upon by the orphans' court, Mother and Father offer excuses for their failure to parent and plans for remedying the circumstances that led to the Children's dependency.

In response, the orphans' court has provided a thorough evaluation supporting termination of Mother's and Father's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b). Having reviewed the notes of testimony and the certified record, we conclude that the orphans' court's findings and conclusions are supported by clear and convincing evidence of record, and we adopt the orphans' court opinion as our own.[3]

Decrees affirmed.

---

[3] The parties are directed to attach a copy of the orphans' court's opinion of April 23, 2018, to any future filings in this matter.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/21/18

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
JUVENILE COURT DIVISION

| IN THE INTEREST OF | : | |
| | : | |
| S      H    , a minor | : | 76 OCA 2017 |
| | : | |
| | : | Appeal No. 934 EDA 2018 |

| IN THE INTEREST OF | : | |
| | : | |
| B      H   , a minor | : | 77 OCA 2017 |
| | : | |
| | : | Appeal No. 934 EDA 2018 |

| IN THE INTEREST OF | : | |
| | : | |
| T      H___, a minor | : | 78 OC2017 |
| | : | |
| | : | Appeal No. 934 EDA 2018 |

## OPINION PURSUANT TO Pa. R.A.P. 1925(a)

L.D. ("Mother") and B.H. ("Father") have appealed our February 21, 2018 decrees that terminated their parental rights to their daughters, S.H., age nine, and T.H., age seven, as well as their son, B.H., who is six years old (collectively the "Children"). Mother and Father have complied with the Children's Fast Track rules by filing a Rule 1925(b) statement with their notices of appeal. We now issue this opinion pursuant to Pa.R.A.P. 1925(a).

### Background

The challenged decrees were issued after a consolidated hearing convened on February 21, 2018 on the petitions of Monroe County Children and Youth Services ("CYS" or the "Agency") for a goal change in the underlying dependency cases and for

1

termination of both parents' parental rights in these orphan's court proceedings. At the end of the hearing, before issuing the decrees, we stated on the record our findings and reasons for terminating parental rights. (N.T., 2/21/2018, pp. 96-106). We incorporate our remarks into this opinion by reference. Our on-record statements suffice to explain our reasoning and to address the parents' bald assertion that the decrees were "not supported by competent or sufficient evidence in the [they are] based entirely on the parents' incarceration." Nonetheless, in light of these appeals, we highlight, amplify, and supplement our statements as follows:

The family first came to the attention of CYS in 2012. At that time, the referral concern was parental drug and alcohol abuse. The referral was investigated but unaccepted. (*Id.* at 11). Nonetheless, drugs and alcohol abuse became the bane and undoing of this family and has adversely impacted the Children. Specifically, addiction led to lack of housing, employment issues, incarceration, inability and incapacity to parent, and placement of the Children.

On June 11, 2015, the Children were taken into protective custody due to Mother's drug use and pending arrest on drug charges. Among other things, Mother admitted to using marijuana and heroin, with the police finding numerous empty heroin bags, marijuana, and other drug paraphernalia in the home. At the time, Father was incarcerated.

After a shelter care hearing, emergency protective custody was continued. During the subsequent dependency hearing, the Children's Paternal Grandmother expressed her willingness to be a resource. As a result, the Children were not adjudicated dependent and legal and physical custody of the Children was awarded to

2

Paternal Grandmother. (*Id.* at 11-14, 44). From that time until the present, the Children have been in the care of persons other than Mother and Father.

On July 8, 2015, Paternal Grandmother called CYS and indicated that she did not have the financial means to care for the Children. However, Paternal Grandmother later advised the Agency that she could care for the Children with the help of other family members. (*Id.*).

Unfortunately, in the long run Paternal Grandmother was unable to hold the family together. On May 14, 2016, CYS received a referral that Paternal Grandmother was threatening to kill herself, that she was about to lose her home to foreclosure, and that the family was without food or working utilities. At the time, Mother and Father were incarcerated and no other family members were available as resources for the Children. As a result, emergency protective custody was granted and the Children were placed in foster care. Several days later, the Children were adjudicated dependent. The Children have remained dependent and in care, in the same foster home, since that time. (*Id.* at 13-17).

CYS arranged visits between Paternal Grandmother and the Children and worked with Paternal Grandmother to address the issues that were preventing her from caring for the Children. Although she tried for a while, Paternal Grandmother was unable to overcome the issues and remedy the conditions that caused the Children to come into care. In or about February 2017, Paternal Grandmother informed CYS that she no longer wished to be involved with the Children in any capacity. Sadly, since that time Paternal Grandmother has voluntarily withdrawn from the Children's lives. (*Id.* at 15-17 & 24).

3

With respect to Mother and Father, this case is marked by incarceration, long periods of time in which one or both did not visit the Children, failure to parent, and failure to make reasonable efforts to parent.

Father has been in jail the entire time the Children have been in care. He has been incarcerated on a federal sentence for fraud and violating tax laws which was run concurrent with and extended past Father's release on a state sentence for theft by extortion. According to Father, who is now in a federal prison in West Virginia, he will be released, or at least will be eligible for release, in February of 2019. However, he will be under federal supervision for two years. In addition, he owes restitution of $291,000. (*Id.* at 53, 57-59, 67).

Father began serving his sentence at SCI Dallas, a prison located in a neighboring county. CYS had contact with him there. Father indicated that he would be taking drug and alcohol classes. He requested visits; however, there was a delay while Father satisfied visitation requirements and necessary paperwork was prepared. Requirements were satisfied in December of 2016. Thereafter, the Children visited Father three times at SCI Dallas, the last visit occurring in April 2017. At that point, Father was released on his state sentence and taken to a federal prison in West Virginia to finish out his federal sentence. Father has not seen or contacted the Children since. Father cites distance as the reason for the lack of visits. However, the record demonstrated and Father did not dispute that he has had no contact with the Children, by phone calls, letters, cards, or otherwise, did not send them gifts, and did not reach out to them through CYS or their foster mother, whom Father said he knew before being incarcerated, since being moved to West Virginia. At the hearing, Father

4

testified that he had participated in programs while in state prison. However, despite requests, Father has not provided CYS with proof of completion of the programs. In the federal system, Father wants to participate in relevant programs in the future, but is not enrolled in any now. Father also testified about his post release plans. He has no specific home plan other than to come back to this area when he is able and permitted to do so and to cash-in on a purported promise from a contractor to give him an off-the-books job. Father has no support system here. He does not know what his relationship with Mother is or will be but, acknowledging that he is accountable and desiring to be held responsible, he wants to support Mother and atone for the negative impact he admits he had on her. (*Id.* at 24-28, 33-36, 40, 57-59, 67).

Mother was incarcerated in SCI Muncy. CYS caseworkers contacted Mother both before she was transferred to Muncy and after she was in jail there. Mother advised that she was in or would be taking a drug and alcohol class and planned on participating in a parenting program. Mother advised that she would not be allowed to have visitation with the Children at SCI Muncy until she completed the parenting program. Mother did not complete her parenting courses until she was almost about to be released. As a result, Mother did not visit with the Children while incarcerated. She did, however, call the Children at their foster home. The Children's foster mother permitted the calls; however, the calls became less frequent after Mother asked foster mother to put money on Mother's prison account. (*Id.* at 20-25).

In June of 2017, Mother was released from SCI Muncy to a halfway house. From that point on, her phone contact with the Children was neither as frequent nor consistent as it had been while she was incarcerated. (*Id.* at 25).

5

Mother requested a visit with the Children. As a result, a referral for visit coaching was made and visitation arrangements were set in motion. However, before the visit could be arranged Mother indicated that she would be moving to another halfway house, one that was closer to this area. (*Id.* at 26). Although Mother was indeed moved to a halfway house that is located in a neighboring county, she did not visit with the Children.

In October of 2017, CYS sent letters to Mother and Father notifying them that the Agency would be filing for termination of parental rights. Father did not specifically respond. The notification upset Mother, but did not prompt her to meaningful action. At the time of the notification, Mother did not have a home suitable for the Children, was still in a halfway house, and, despite being out of jail since June, had not visited the Children. (*Id.* at 28-29).

Later in October 2017, CYS filed the instant petitions for termination of parental rights. The Agency also filed petitions in the underlying dependency proceedings asking this Court to conduct permanency reviews and change the goal for each of the Children to termination of parental rights and adoption.

Subsequently, a post-petition visit was scheduled for Mother. However, once again, the visit did not happen because Mother moved to a different halfway house. CYS spoke with Mother on November 27, 2017 about the move. Mother was supposed to provide information as to where her new residence would be so that visits with the Children could be set up, but Mother never provided the information. (*Id.* at 29-30).

On December 18, 2017, Mother called the foster home for the first time in a

6

month. She left no message. (*Id.* at 31).

In January of 2018, CYS discovered Mother's whereabouts and sent her documents, including releases that would permit the Agency to obtain information about services she was receiving. This prompted Mother to contact CYS and ask for a visit. The visit was set up and, on February 9, 2018, almost eight months after her release from jail, Mother finally visited the Children. Mother was appropriate during the visit and brought gifts for the Children. (*Id.* at 32).

As of the termination of parental rights hearing, Mother had not given CYS proof of housing, employment, programs in which she is participating, or services she is receiving. Through a letter from Catholic Social Services in Scranton, the Agency was able to glean that Mother was in a halfway house there. Later, at the hearing, Mother testified that she had a job sewing army bags for North American Manufacturing in Scranton. (*Id.* at 33-34, 76). However, no employment documentation was submitted.

At that point, the Children had been in the care of persons other than Mother and Father for 32 months and had been dependent and in foster care for 21 months. The Children have been in the same pre-adopt foster home the entire time they have been dependent. The Children are bonded with their foster mother and she is bonded with them. At least one of the Children calls their foster mother "Mom," and all are looking forward to their foster mother becoming their "forever Mom." (*Id.* at 51).

As to Mother and Father, there was some evidence of a bond between the Children and their parents. However, we found that the bond was attenuated by, among other things, the following: 1) Mother and Father have neither parented nor demonstrated the ability to parent for much longer than the Children have been in

7

care; 2) the Children have been in the care of others for more than 32 months, first with Paternal Grandmother and then with foster mother; 3) Father has seen the Children only three times, all during prison visits, in the last two and one-half years; 4) Father has not contacted or even attempted to contact the Children since the last prison visit in April of 2017; 5) Mother had not seen the Children for almost two years prior to the post-petition visit in February of 2018; 6) the February 2018 visit is the only visit Mother has had had with the Children in the eight months since she was released from prison; and 7) very significantly, the bond between the Children and their foster mother is strong – stronger than any bond that exists between the Children and their biological parents.

Foster mother is taking care of the Children's educational, medical, emotional, mental health, and daily needs. Not surprisingly, due to the circumstances that brought the Children into care, the Children have been diagnosed with adjustment and conduct disorders, with B.H.'s behavioral issues having recently been escalated. In this regard, CYS and foster mother noted that B.H.'s behavior worsened after speaking on the phone with Mother. However, the Children are in therapy and foster mother is ensuring that their counseling needs are being met. (*Id.* at 18, 22-23, 30).

At the termination hearing, CYS asked that dependency be continued as to all three of the Children, that the dependency goal be changed to adoption for all three of the Children, and that the parental rights of Mother and Father be terminated as to all three of the Children. (*Id.* at 93-95). The Children's guardian *ad litem* agreed with the requests and arguments of the Agency. (*Id.* at 95-96).

At the end of the hearing, we continued dependency and changed the

8

dependency goals to adoption. Neither parent challenged the dependency rulings. As discussed, we also terminated the parental rights of both parents to all three of the Children, stating our reasons for doing so on the record. (*Id.* at 96-106).

## Discussion

### 1.    The Law

The law that we applied in terminating Mother's and Father's parental rights is well settled.  In comprehensive summary:

In termination cases, the burden is upon the petitioner, in this case CYS, to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008). Clear and convincing evidence has been defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re K.Z.S.*, 946 A.2d 753, 757 (Pa. Super. 2008) (citation omitted).  It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

Termination of parental rights is controlled by Section 2511 of the Adoption Act, 23 Pa. C.S.A. Section 2511. In this case, CYS sought termination of Mother and Father's parental rights on the following grounds:

**Section 2511. Grounds for Involuntary Termination**

(a)   General Rule. -- The rights of a parent in regard to a child
       may be terminated after a petition filed any of the following

9

grounds:

(1)     The parents have, for a period of more than six (6) months prior to the filing of this petition, failed to perform their parental duties;

(2)     The repeated and continued incapacity, abuse, neglect or refusal of the parents has caused the child to be without essential parental care, control or subsistence necessary for his physical and mental well-being and the conditions and causes of the inability, abuse, neglect or refusal have not been remedied by the parents;

(5)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child;

* * *

(8)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

(b)     Other considerations – The court in terminating the rights of a parent shall give primary consideration of the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as

10

inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C.S.A. Section 2511(a)(1), (2), (5), (8), and (b). Satisfaction of any subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for involuntary termination of parental rights. *In re K.Z.S., supra; In re R.J.S.*, 901 A.2d 502 (Pa. Super. 2006). Accordingly, an appellate court "need only agree with the orphan's court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *app. den.*, 863 A.2d 1141 (Pa. 2004). *See also In re Adoption of C.J.P.*, 114 A.3d 1046 (Pa. Super. 2015); *In re K.H.B.*, 107 A.3d 175 (Pa. Super. 2014).

Section 2511 requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). *See also In re Adoption of C.J.P., supra; In re T.D., supra; In re Adoption of R.J.S., supra.*

11

In analyzing the conduct of a parent, the applicable statutory language must be considered. As the third sentence of Section 2511(b) directs, when subsections (a)(1), (6), or (8) of Section 2511(a) are cited as the grounds for termination, we may not consider actions of a parent to remedy the conditions that necessitated the dependent child's placement which are initiated after the parent receives notice of the filing of the termination petition. *In re Adoption of C.J.P., supra; In re K.Z.S., supra; In re D.W.*, 856 A.2d 1231 (Pa. Super. 2004).

Under Section 2511(a)(1), parental rights may be terminated if, for a period of at least six months, a parent *either* demonstrates a settled purpose of relinquishing parental claims to a child *or* fails to perform parental duties. *In re Adoption of R.J.S., supra; In re Adoption of J.M.M.*, 782 A.2d 1024 (Pa. Super. 2001). As the Superior Court has explained:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.

*In re K.Z.S., supra* at 758 (Pa. Super. 2008) (case citations and quotation marks omitted). *See also In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct. Rather, those grounds may include acts of refusal as well as incapacity to perform parental duties.

12

Parental rights may be terminated pursuant to Section 2511(a)(2) if three conditions are met: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental wellbeing. 23 Pa.C.S.A. § 2511(a)(2). Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and **strong, continuous parental ties**, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.... Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties.

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (case citations and internal quotation marks omitted) (emphasis in original). *See In re Adoption of R.J.S., supra.* Thus,

While sincere efforts to perform parental duties can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

13

*In re Z.P.*, 994 A.2d at 1117-18 (case citations and internal quotation marks omitted). Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child. *In re Adoption of Michael J.C.*, 486 A.2d 371, 375 (Pa. 1984); *In re Z.P, supra*.

In order for termination pursuant to 23 Pa.C.S.A. § 2511(a)(5) to be proper, "the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child." *In re K.H.B.*, 107 A.3d 175 (Pa. Super. 2014) (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1273–74 (Pa. Super. 2003)). *See also In re Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007), *app. den.*, 951 A.2d 1165 (Pa. 2008).

To terminate parental rights under Section 2511 (a)(8), the party seeking termination of parental rights need only show "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or the placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of R.J.S., supra* at 511. *See In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). The one year time period is significant. As the Superior Court has explained:

> Section 2511(a)(8) sets a twelve–month time frame for a
> parent to remedy the conditions that led to the children's

14

removal by the court. Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic period. The relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing. This Court has acknowledged:

> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re I.E.P.*, 87 A.2d 340, 345-46 (Pa. Super. 2014) (case citations and internal quotation marks omitted).

With respect to the "needs and welfare" analysis pertinent to subsections 2511(a) (5) and (8), and (b), the Superior Court has observed:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the 'needs and welfare of the child' prior to proceeding to Section 2511(b), which focuses on the 'developmental, physical and emotional needs and welfare of the child.' Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights,

15

pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa. Super. 2008) (*en banc*) (citations omitted). *See also In re I.E.P., supra; In re Adoption of K.J., supra* at 1133. Subsection 2511(a)(8), "does not require an evaluation of the remedial efforts of either the parent or DHS." *In re B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012) (citing *C.L.G.*, 956 A.2d at 1007).

Simply put, Section 2511, including the subsections cited and explained above, outlines certain irreducible requirements that parents must provide for their children. Parents who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have their parental rights terminated. *In re K.Z.S., supra; In re B.L.L.*, 787 A.2d 1007 (Pa. Super. 2001).

There is no simple or easy definition of parental duties. However, the appellate cases make it very clear that parenting is an active rather than a passive obligation that, even in the face of difficulty, adversity, and incarceration, requires a parent to take and maintain a place of importance in the child's life. The following passage is instructive:

Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and

16

support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

\* \* \*

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.*, *supra* at 759. *See also In re Burns*, 379 A.2d 535 (Pa. 1997); *Adoption of Baby Boy A. v. Catholic Social Services of the Diocese of Harrisburg*, 517 A.2d 1244 (Pa. 1986); *In re Shives*, 525 A.2d 801 (Pa. Super. 1987).

In relation to the parental requirements outlined in Section 2511, when a parent is separated from his or her child, it is incumbent upon the parent "to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life." *In re G.P.-R.,* 851 A.2d 967, 977 (Pa. Super. 2004). When a parent has abandoned or effectively abandoned a child,

[t]o be legally significant, the post abandonment contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to understand the parental role. *The parent wishing to reestablish his*

17

> *parental responsibilities bears the burden of proof on*
> *this question.*

*In re T.D.*, 949 A.2d at 919 (case citations and brackets omitted) (emphasis in original). Finally, parents are required to make diligent efforts towards assumption or resumption of full parental responsibilities. Accordingly, a parent's vow to cooperate, after a long period of being uncooperative regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *In re Adoption of K.J.*, *supra; In re A.L.D.*, 797 A.2d 326 (Pa. Super. 2002).

Once statutory grounds for termination have been established, the court must, in accordance with Section 2511 (b), consider whether the child's needs and welfare will be met by termination. A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. Intangibles such as love, comfort, security, and stability are involved in the inquiry. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond, if any, between parent and child. If a bond is determined to exist, the effect on the child of permanently severing the bond must be analyzed and considered. *See In re K.M.*, 53 A.3d 781 (Pa. Super. 2012); *In re T.D., supra; In re L.M., supra; In re Adoption of R.J.S., supra.* As to the bond analysis, the Superior Court has stated:

> In conducting a bonding analysis, the court is not required
> to use expert testimony, but may rely on the testimony of
> social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108,
> 1121 (Pa. Super. 2010). This Court has observed that no
> bond worth preserving is formed between a child and a
> natural parent where the child has been in foster care for
> most of the child's life, and the resulting bond with the
> natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753,
> 764 (Pa. Super. 2008).

18

*In re K.H.B.*, 107 A.3d 175, 180 (Pa. Super. 2014).

In addition to a bond examination, a court may equally

> emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*In re K.Z.S.*, 946 A.2d at 763 (emphasis in original).

When, as here, the petitioner is an agency, "it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b). However, the existence or absence of a pre-adoptive home is an important factor. So is the relationship between the child and the foster or pre-adoptive parents. As our Supreme Court cogently stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. *In re: T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). *See In re K.M., supra.*

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated:

> [I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.' 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to

19

include '[i]ntangibles such as love, comfort, security, and stability. In *In re E.M.,* [620 A.2d 481, 485 (Pa. 1993) ], this Court held that the determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention'" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.* 71 A.3d at 267. The Court additionally observed:

> contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved....Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.
>
> In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to

20

expedite children's placement in permanent, safe, stable, and loving homes. ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children.

*In re T.S.M.*, 71 A.3d at 269.

In this case, Mother was incarcerated for 24 of the 32 months that that the Children have continuously been in the care of others. Father, in turn, has been incarcerated since June of 2015 and will be released, at the earliest, in February of 2019. Incarceration, standing alone, neither constitutes sufficient grounds for termination of parental rights nor removes the obligation to perform required "bond effects" and "needs and welfare" analyses. However, it is a factor that must be considered and, in a proper case, such as when a parent is serving a prohibitively long sentence, may be determinative. *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012); *Z.P.*, 994 A.2d at 1120. "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind...that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what [he or] she is supposed to be doing in prison." *In re E.A.P.*, 944 A.2d at 84.

The analysis depends in part on the asserted grounds for termination. In subsection (a)(1) abandonment cases, our Supreme Court has stated:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in

21

prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.*, 47 A.3d at 828 (quoting *In re Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975) (footnotes and internal quotation marks omitted). Thus, in an abandonment case, a parent is required to *both* utilize available resources *and* take affirmative steps to support a parent-child relationship. If the parent fails to do so, his or her parental rights may be terminated. *See In re Adoption of W.J.R.*, 952 A.2d 680 (Pa. Super. 2008); *In re E.A.P., supra; In re K.J., supra.* However, utilization of available resources does not guarantee preservation of parental rights. The statutory criteria, the facts and circumstances of each case, and the best interests, needs, and welfare of the child must all still be considered.

In cases involving parental incapacity, our Supreme Court recently held that:

incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P*, 47 A.3d. at 828. In more expanded terms, the Supreme Court stated:

In line with the expressed opinion of a majority of justices in *In re R.I.S.*, 614 Pa. 275, 36 A.3d 567 (2011), our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of

22

> providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*Id.* at 830. In sum, a parent's incarceration "is relevant to the subsection (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the "essential parental care, control or subsistence" that the section contemplates." *In re A.D.*, 93 A.3d at 897.

Finally, before filing a petition for termination of parental rights, the Commonwealth is generally required to make reasonable efforts to promote reunification of parent and child. *In re Adoption of R.J.S.. See also In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). However, the Commonwealth does not have an obligation to make reunification efforts indefinitely.

> The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. When reasonable efforts to reunite a foster child with his or her biological parents have failed, then the child welfare agency must work toward terminating parental rights and placing the child with adoptive parents. The process of reunification or adoption should be completed within eighteen (18) months. While this time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

23

*In re Adoption of R.J.S., supra* at 507 (internal case citations, quotation marks, and footnote omitted).

Additionally, the failure of an agency to make reasonable efforts to promote reunification of parent and child will not defeat a properly supported petition for termination of parental rights. Neither the relevant provisions of Section 2511 nor the pertinent provisions of the Juvenile Act require a court to consider the reasonable efforts provided to a parent by the petitioning agency prior to termination of parental rights. *In re D.C.D.*, 105 A.3d 662 (Pa. 2014); *In re Adoption of C.J.P., supra.* In *In re D.C.D.*, our Supreme Court

> analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. *Id.* at 671–75 (citation omitted). The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child. *Id.* at 676–77. While the Supreme Court in *D.C.D.* focused its analysis on Section 2511(a)(2), we find the Supreme Court's reasoning equally applicable to Section 2511(a)(8). Like Section 2511(a)(2), nothing in the language of Section 2511(a)(8) suggests that reasonable reunification services are necessary to support the termination of parental rights.

*In re Adoption of C.J.P., supra* at 1055. Thus, while agencies must provide reasonable efforts to enable parents to work toward reunification with their dependent children when ordered to do so, "the remedy for an agency's failure to provide services is not to punish an innocent child, by delaying her permanency through denying termination,

24

but instead to conclude on the record that the agency has failed to make reasonable efforts, which imposes a financial penalty on the agency of thousands if not tens of thousands of dollars under federal law." *In re D.C.D.*, 105 A.3d at 675.

2.    Parental Rights Were Properly Terminated

Applying the law summarized above to the facts of these cases, we found that statutory grounds for termination of Mother's and Father's parental rights had been established by clear and convincing evidence, and further, that termination of their rights best served the needs and welfare of the Children. Prompted by the instant appeals, we have again carefully reviewed the record. We remain convinced that our decisions are supported by both the facts and the law, and, moreover, fulfilled and advanced the best interests of the Children.

As noted, we articulated our findings and stated our reasons for terminating parental rights on the record at the conclusion of the termination hearing. (N.T., 2/21/2018, pp. 96-106). In more expanded form:

CYS has been involved with this family and the Children have been in the care of others since June of 2015. The Children have been dependent and in foster care since May of 2016. The Children's time in care far exceeds the minimum periods specified in the statutory termination provisions cited by the Agency. There is and can be no question that the pertinent time requirements have been satisfied.

In addition, as even a brief review of the evidence, our on-record statements, and the summary of facts set forth above demonstrates, both parents have failed to perform parental duties for more than one year, both parents have demonstrated a lack of capacity to perform parental duties, and both parents have refused to perform

25

parental duties, a failure especially clear as to Mother who has not even attempted to parent the Children since being released from prison. Further, the conditions that caused the Children to come into care remain. Among other things, Father is still incarcerated. He has no specific housing or release plan and his hoped-for post-release employment is speculative at best. When released, Father will be under parole supervision for at least two years and will need to pay almost $300,000 in restitution. Mother, in turn, is still under parole supervision, is living in a halfway house, and does not have a suitable home for the Children. While drug and alcohol abuse does not seem to be an issue for either parent at the moment, despite requests by CYS Mother and Father have failed or refused to provide documentation of treatment or successful completion of programs.

Father has visited the Children only three times since June of 2015, all of which occurred in prison, and while distance may be a partial explanation for lack of visits at his current jail, there is no excuse or justification for Father's failure to maintain any type of contact with the Children since April of 2017. While incarcerated, Father simply did not avail himself of available resources nor did he take affirmative steps to support a parent-child relationship. Similarly, despite being released from prison in June of 2017, Mother has inexplicably seen the Children only once since June of 2015. Further, her phone contact has waned. Both during her incarceration and after her release, Mother neither fully utilized available resources nor took affirmative steps to support a parent-child relationship. Moreover, and very significantly, neither parent has done anything to promote the mental, physical, spiritual, or emotional well-being of the Children. Rather, for almost three years others – at first Paternal

26

Grandmother and most recently foster mother – have provided nurturing and care for the Children and have insured that their physical, mental, emotional, medical, developmental, and daily needs have been met. Finally, as discussed below, termination of both parents' parental rights satisfies the needs, welfare, and best interests of the Children.

Under these circumstances and the evidence presented at hearing, it was clear to us that CYS established grounds for termination of Mother's and Father's parental rights to the Children under subsections 2511(a)(1), (2), (5), and (8).[1] It is just as clear to us now.

In their single, bald assignment of error, each parent alleges that our decision to terminate parental rights was based "entirely on the parents' incarceration." Our on-record statements and the recitation of facts and discussion in this opinion debunk this assertion. We considered the parents' incarceration; however, we did not do so exclusively. Rather, in accordance with the law recited above, we kept in mind that the Children's "need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what [he or] she is supposed to be doing in prison." *In re E.A.P.*, 944 A.2d at 84. We considered the length of time Mother was incarcerated, Father's continued incarceration, the subsequent periods each parent will be under state or federal supervision, the impact the parents' incarceration has had on the Children, and the degree to which each parents' incarceration incapacitated him or her from performing parental duties under both the general and statutory meanings of that term. Significantly, we found and considered that: 1) since

---

[1] As indicated, when analyzing subsections (a)(1) and (8), we are not permitted to consider post-petition efforts by the parents. Thus, as to those subsections, Mother's lone post-petition visit with the Children (and any other post-petition effort that either Mother or Father may be found to have made) does not and cannot change the analysis.

27

at least April of 2017, Father has neither utilized available resources nor taken affirmative steps to support a parent-child relationship; and 2) while incarcerated, Mother utilized only phone calls to keep in touch with the Children and did not take any other affirmative steps, such as doing what was required to earn visits, to support a parent-child relationship. Perhaps even more significantly, we considered the fact that, while Mother and Father were incarcerated, foster mother cared for the Children and a very strong, healthy bond developed between them. The parent's bald assignment of error lacks merit.

With respect to the bond effects and needs and welfare analyses required by Sections 2511 (a)(5) and (8) and (b), it was clear to us that the best interests and welfare of the Children required that Mother's and Father's parental rights be terminated. At the termination hearing, both parents indicated that they love the Children and do not want their rights terminated. However, a parent's own feelings of love and affection for a child, standing alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010); *In re L.M.*, 923 A.2d 505 (Pa. Super. 2007). This is especially true where, as here, the parent's actions do not support their words. Again, Mother has visited the Children only once in three years, and in the eight months since her release from prison has neither resumed parental responsibilities nor taken affirmative steps to support a parent-child relationship. Father, in turn, has not even contacted or attempted to contact the Children since he was transferred to a federal prison. Further, while there was some evidence presented at the termination hearing of a bond between the parents and the Children, for the reasons set forth above the evidence showed and we found that any bond that exists

28

has become attenuated and has been supplanted by the even stronger bond that exists between the Children and their foster mother who wants to adopt them. Additionally, neither parent has demonstrated the parental capability and stability that the Children need.

The Children have been living almost three years without their parents. They need and deserve permanency, stability, love, support, and parental care. Their needs have not been met by Mother or Father. Others, especially foster mother, have provided parenting for the Children while Mother and Father did not. Further, nothing in the record suggests that Mother or Father will be able to meet the Children's needs in the future, especially considering all that both need to do to satisfy their criminal court obligations and get themselves back on their feet. Moreover, given the facts presented at hearing, and considering Mother's and Father's history, we found that the Children's lives simply could not and should not be put on hold in the hopes that, at some point in the future, Mother, Father, or both will summon the ability to handle the responsibilities of parenting while maintaining stable and suitable housing, a job, and sobriety.

On the other hand, the Children are doing well living with foster mother. The Children have bonded with foster mother, and she with them. Similarly, the Children want to be adopted by foster mother and she wants to adopt them. Simply, foster mother has provided the Children with the love, support, nurturing, and care that Mother and Father have been unable to provide.

Under these facts, we found that whatever bond exists between Mother and Father and the Children is neither as strong nor as enduring and nurturing as the bond

29

that exists between the Children and foster mother. Consistently, we found that severing parental ties with Mother and Father would not harm the Children mentally, emotionally, or spiritually, while breaking the bond with foster mother, who has been their parent, would do the Children significant harm.

Simply, under the facts and circumstances of this case, we found that termination of Mother's and Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of the children and promote the children's best interests.

We stand by our decision.

Date: 4/23/2018

Jonathan Mark, J.

Clerk of Courts
APR 23 '18 AM 11:16

Cc:  Superior Court of Pennsylvania
Jonathan Mark, Judge
Brandie Jean Belanger, Esq.
Elizabeth B. Weekes, Esq.
Public Defender (J.T.F.)

30